Extermitech, Inc., appeals from a summary judgment for Glasscock, Inc., and Chuck Glasscock (collectively "Glasscock") on Glasscock's cross-claim against Extermitech. For the reasons set forth below, we affirm that judgment in part and reverse it in part.
 I. Facts
Chuck Glasscock operated Glasscock, Inc., a pest-control business in Montgomery from 1996 through 2001. On May 31, 1996, Glasscock, Inc., issued a residential termite soil treatment certificate ("the certificate") for termite-control services to the builder of a new residence at 7131 Wyngrove Drive in Montgomery. The certificate stated, in pertinent part:
 "This guarantee of termite soil treatment assures the property owner that the chemical used, their [sic] concentration, the method and rate of application comply with all applicable federal and state standards.
 ". . .
 "Guarantee: Glasscock, Inc., guarantees to the property owner and/or mortgagor that the soil [at 7131 Wyngrove Drive] has been treated that the chemical used in the treatment, its concentration, rate, method and location [comply with applicable HUD regulations.]
 "Glasscock, Inc., also certifies to the owner, his successor or assigns, that the soil [at 7131 Wyngrove Drive] has been treated and that the chemical used in the treatment, its concentration, the method and rate of application comply with current standards of the appropriate regulatory bodies.
 "Glasscock, Inc. hereby agrees that if termite infestation should occur within one (1) year from the date of the original soil treatment, Glasscock, Inc., will retreat the soil and/or structures according to all state and federal regulatory standards in effect at the time, without cost to the owner and/or mortgagor.
 "Glasscock, Inc., further agrees to repair all construction damage caused by active *Page 691 
subterranean termites within the one (1) year builder warranty period. The repairs will be made without cost to the owner and/or mortgagor.
 "The retreat warranty may be extended on a year to year basis after the original twelve (12) month period by the payment of a negotiated annual reinspection fee. The extension of the retreat warranty will be subject to the terms and conditions of a separate warranty agreement which must be agreed upon by the owner of the property at that time."
Jim McGlaughlin and Kayla McGlaughlin purchased the newly constructed house at 7131 Wyngrove Drive in 1996. The warranties in the certificate extended to the McGlaughlins, as the owners of the property, by the terms of the certificate.
The McGlaughlins allege that, between 1996 and 2001, they renewed and extended the "retreat" warranty in the certificate by requesting that Glasscock perform termite inspections. The McGlaughlins also allege that termite infestation was evident at their house in May 2001. They contend that Glasscock had knowledge of that infestation and that, at that time, assured them that Glasscock was performing the termite re-treatment services contemplated in the certificate.
On November 1, 2001, Extermitech and Glasscock executed a "Contract for Purchase of Business" under which Extermitech agreed to pay $285,000 for the assets (including the termite-warranty contracts, equipment, inventory, and customer lists) used in the business of Glasscock, Inc. ("the purchase contract"). The purchase contract stated that the transaction was a sale of assets (not a transfer of the stock of Glasscock, Inc.), that Glasscock would not compete against Extermitech in the pest-control business in Montgomery County for five years following the closing of the transaction contemplated in the purchase contract, and that Glasscock would keep all accounts receivable resulting from termite-service work that had been performed before that closing.
The purchase contract contained multiple provisions relating to the parties' post-sale responsibility for the liabilities of Glasscock, Inc. Page one of the purchase contract stated: "This is to be a purchase of assets only; it is understood that [Extermitech] shall not assume any of the liabilities of [Glasscock]." Additionally, the following provision appears on pages 2-3 of the purchase contract:
 "[Glasscock] agrees to indemnify and hold harmless [Extermitech] for any and all of its liabilities, accounts payable, or any debt which is secured by any of the inventory, equipment or other assets which are to be transferred at closing. However, it is understood that [Extermitech] will assume full responsibility and liability under termite warranties previously issued and transferred to [Extermitech] pursuant to this agreement."
The sale of the assets of Glasscock, Inc., closed in or about January 2002; the point at which the transaction closed is hereinafter referred to as "the closing."[2] Effective as of the closing, Glasscock assigned the certificate for the McGlaughlins' house to Extermitech and ceased operations.
In May 2002 Extermitech performed a termite inspection of the McGlaughlins' house. The McGlaughlins allege that the certificate, which included the re-treat warranty, was renewed at that time by their payment of a reinspection fee. The McGlaughlins further allege that, in August *Page 692 
2002, they noticed evidence of termite infestation in the same part of their house as the infestation reported to Glasscock in May 2001.
In March 2003 the McGlaughlins sued Glasscock and Extermitech in the Montgomery Circuit Court, asserting the following claims: count I — fraud;[3] count II — negligence and wantonness; count III — breach of contract; and count IV — breach of warranties. The McGlaughlins' claims have not yet been adjudicated at trial.
Relying principally on the provision in the purchase contract under which Extermitech "assume[d] full responsibility and liability under termite warranties," Glasscock filed a cross-claim against Extermitech, requesting the following relief:
 "[If] the finder of fact determines that [Glasscock is] in any way responsible for any damage to [the McGlaughlins] in the underlying action, Extermitech [should] . . . indemnify [Glasscock] for any judgment returned [against Glasscock] in [the McGlaughlins'] cause; [and]
 "Extermitech . . . should reimburse [Glasscock] for all attorney's fees incurred to date and in the future in the underlying cause."
Glasscock filed a motion for a summary judgment on its cross-claim on April 29, 2004. The trial court granted that motion "in its entirety" on October 18, 2004, after considering Glasscock's submissions on summary judgment, the parties' briefs, and arguments of counsel. The trial court certified its judgment as final under Rule 54(b), Ala.R.Civ.P.
 II. Standard of Review
The well-settled standard of review for a summary judgment was recently stated in Prince v. Poole, 935 So.2d 431
(Ala. 2006):
 "`This Court's review of a summary judgment is de novo. We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(e) Ala. R. Civ. P. In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Ala. Code 1975, § 12-21-12. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'"
935 So.2d at 442 (quoting Dow v. Alabama DemocraticParty, 897 So.2d 1035, 1038-39 (Ala. 2004)) (citations to cases omitted). Further, when reviewing a summary judgment, we consider the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant.Prowell v. Children's Hosp. of Alabama, 949 So.2d 117,126 (Ala. 2006). Moreover, we consider questions of law de novo when reviewing a summary judgment. Alabama Elec. Coop., Inc.v. Bailey's Constr. Co., 950 So.2d 280 (Ala. 2006).
 III. Discussion
The facts pertinent to Glasscock's summary-judgment motion are undisputed. *Page 693 
Referring to the language in the purchase contract stating that Extermitech "assume[d] full responsibility and liability under termite warranties," the trial court ordered Extermitech to indemnify Glasscock for any judgment that may be entered in favor of the McGlaughlins and against Glasscock in the McGlaughlins' action against Glasscock and Extermitech. Extermitech's argument on appeal is that the trial court misinterpreted the intended scope of the indemnity provision in the purchase contract when it ordered Extermitech to indemnify Glasscock for conduct that occurred before the closing.
The McGlaughlins' claims arise from alleged acts and omissions in the performance of termite-control services that occurred both before and after the closing. Before the closing, Glasscock issued the certificate, which contained termite warranties for the McGlaughlins' residence, and performed termite-control service at that residence. Extermitech does not dispute that after the closing it had responsibility to perform the termite-warranty services and obligations contemplated in the certificate Glasscock assigned to Extermitech as part of the sale of its assets. Extermitech concedes that it should indemnify Glasscock for claims resulting from Extermitech's failure, after the closing, to perform obligations in the assigned certificate.
The operative indemnity provision consists of two sentences on pages 2-3 of the purchase contract. In the first sentence, Glasscock agreed "to indemnify and hold harmless [Extermitech] for any and all of its liabilities, accounts payable, or any debt which is secured by any of the inventory, equipment or other assets which are to be transferred at closing." A fair reading of this sentence would place "all" liability on Glasscock for any claims arising from the performance of termite-control services before the closing. The second sentence states: "However, it is understood that [Extermitech] will assume full responsibility and liability under termite warranties previously issued and transferred to [Extermitech] pursuant to this agreement."[4]
Glasscock argues that, under the above-quoted indemnity provision, the parties intended for Extermitech to assume all known or unknown responsibility and liability for conduct of Glasscock's relating to the termite warranties that occurred before the closing.[5] Extermitech contends, however, that it never contemplated indemnifying Glasscock for Glasscock's alleged failure to perform duties under the termite warranties in the assigned certificate or for other conduct by Glasscock that occurred before the closing. Extermitech emphasizes that the second sentence in the indemnity provision does not express an intent on its part to indemnify Glasscock for Glasscock's failure to perform duties under the termite warranties in the assigned certificate.
The problem is that the purchase contract contains no date specifying when Extermitech's obligation to indemnify Glasscock *Page 694 
becomes effective. On the face of the purchase contract, therefore, the indemnity provision is ambiguous, and each party's interpretation of that provision is reasonably plausible.[6]
This Court articulated the standards for construing ambiguous contractual provisions in Homes of Legend, Inc. v.McCollough, 776 So.2d 741 (Ala. 2000):
 "Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. See [Voyager Life Ins. Co. v.] Whitson, 703 So.2d [944,] 948 [(Ala. 1997)]. Under those established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. See id. at 948-49; Sullivan, Long Hagerty v. Southern Elec. Generating Co., 667 So.2d 722, 725 (Ala. 1995). Additionally, `if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed.' Last, if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of contra proferentem, any ambiguity must be construed against the drafter of the contract."
776 So.2d at 746 (some citations omitted; emphasis added). Here we are confronted with an indemnity provision that does not clearly express whether Extermitech assumed liability for Glasscock's conduct before the closing.
Some of this Court's decisions indicate that, once the court determines that a contract is ambiguous, it is for the finder of fact to resolve the ambiguity. See, e.g., McDonald v. U.S.Die Casting Dev. Co., 585 So.2d 853, 855 (Ala. 1991), and Ex parte Harris, 837 So.2d 283, 290 (Ala. 2002). However, as articulated in Alfa Life Insurance Corp. v.Johnson, 822 So.2d 400, 404-05 (Ala. 2001), the court, as a matter of law, should apply rules of construction and attempt to resolve any ambiguity in the contract before looking to factual issues to resolve the ambiguity. The process for interpretation of a contract was described in Alfa as follows:
 "When a trial court is [faced] with a contract issue, it is important for the trial court to determine as soon as practicable the `threshold issue' whether the contract is ambiguous. If the trial court determines that there is no ambiguity, it must' "determine the force and effect of the terms of the contract as a matter of law."' However, if the trial court finds the contract to be ambiguous, it `must employ established rules of contract construction to resolve the ambiguity.' *Page 695 Voyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948 (Ala. 1997). If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise:
 "`If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.'
 "Id. at 949. Where factual issues arise, the resolution of the ambiguity becomes a task for the jury."
822 So.2d at 404-05 (some citations omitted; emphasis added). See, also, Boykin v. Bank of Mobile, 72 Ala. 262, 269
(1882) (construction of contract is a matter for the court unless extrinsic evidence is considered); Lutz v. Van HeynigenBrokerage Co., 199 Ala. 620, 629, 75 So. 284, 288 (1917); and Vesta Fire Ins. Corp. v. Liberty Nat'l Life Ins.Co., 893 So.2d 395, 404 (Ala.Civ.App. 2003) (courts attempt to resolve ambiguities before submitting case to a jury).
Applying the above principles, we examine the four corners of the purchase contract and attempt to reconcile the ambiguity in the indemnity provision in a manner that will give effect to the meaning of all the terms of the purchase contract. Sullivan,Long Hagerty v. Southern Elec. Generating Co.,667 So.2d 722, 725 (Ala. 1995) (court should give effect to all the terms used when attempting to reconcile inconsistent parts of a contract that are "susceptible of reconciliation").
The two sentences in the indemnity provision conflict if we accept Glasscock's interpretation that Extermitechassumed responsibility for Glasscock's pre-closing conduct. A reasonable interpretation of the first sentence is that Glasscock agrees to indemnify Extermitech for "all of [Glasscock's] liabilities" up to the closing. This reference to "all of its liabilities" would relate to Glasscock's pre-closing conduct because, in the ordinary course of business, Glasscock would not incur additional liabilities from termite-control operations after the closing. The sentence immediately following states that Extermitech "will assume full responsibility and liability under termite warranties previously issued and transferred to [Extermitech]" at the closing. Under Glasscock's interpretation that Extermitech assumed all responsibility for events occurring before the closing, the reference to "liability" assumed in the second sentence also covers Glasscock's conduct before the closing. When both sentences are considered in that context, the "all of its liabilities" language in the first sentence and "assume full responsibility and liability" clause in the second indicate that Glasscock and Extermitech each have responsibility for liabilities incurred before the closing.
Alternatively, the two sentences in the indemnity provision do not conflict if Extermitech's obligation to indemnify is construed to arise from its conduct after the closing. If the indemnity provision is so construed, the language in the first sentence whereby Glasscock agreed to indemnify Extermitech for "all of [Glasscock's] liabilities" relates to conduct occurring before the closing, and the language in the second stating that Extermitech "will assume full responsibility and liability" pertains to the period after the closing.
This construction is solidly supported by the following provision on page 1 of the purchase contract:
 "This [transaction] is to be a purchase of assets only, and it is understood that [Extermitech] shall not assume any liabilities of [Glasscock]."
Further, as is customary in transactions involving the sale of business assets, it is evident from the face of the purchase *Page 696 
contract that the closing was the critical demarcation point for delineating the operational responsibilities of the parties. Before the closing, Glasscock had sole responsibility to perform termite services under the certificates it had issued to its customers. Glasscock reaped the entire financial benefit of performing those services and retained all accounts receivable for that pre-closing work it had performed. At the closing, Extermitech paid, and Glasscock received, valuable consideration for the certificates and other assets that were transferred to Extermitech.[7] Only after the closing did Extermitech undertake to perform obligations under the termite warranties and only then did it earn financial benefits from servicing customers holding certificates issued by Glasscock.
As the benefits to Extermitech and its obligations under the termite-service certificates arose only at the closing, construing Extermitech's obligations under the indemnity provision to apply prospectively after the closing is consistent with the overall transaction set forth in the purchase contract. Furthermore, this construction is the most reasonable interpretation of the indemnity provision in the absence of any explicit guidance as to whether Extermitech's agreement to indemnify covered liabilities arising from Glasscock's pre-closing conduct.[8]
In summary, the interpretation of the purchase contract urged by Glasscock does not resolve the facial conflict in the indemnity provision. However, that ambiguity is reconciled where, as here, we construe the indemnity provision to obligate Extermitech to indemnify Glasscock only for Extermitech's performance of or failure to perform obligations under the termite warranties after the closing. Accordingly, we find that the trial court erred to the extent that its summary judgment obligated Extermitech to indemnify Glasscock for claims made by the McGlaughlins that arise from Glasscock's conduct before the closing.[9] *Page 697 
 IV. Conclusion
For the reasons stated herein, we reverse the trial court's summary judgment to the extent it obligated Extermitech to indemnify Glasscock for claims against Glasscock in the underlying action that arise from conduct by Glasscock before the closing. We affirm that judgment to the extent it obligates Extermitech to indemnify Glasscock for claims, if any, against Glasscock in the underlying action that both arise under the termite warranties in the certificate and that result from Extermitech's operations after the closing.
Applying our holdings herein to the specific claims in the underlying action, we conclude that Glasscock is not entitled to indemnity on the McGlaughlins' fraud claim (count I) or the negligence and wantonness claims (count II). Further, Extermitech is not obligated to indemnify Glasscock for any judgments on the McGlaughlins' breach-of-contract claim (count III) and breach-of-warranties claim (count IV) that arise from Glasscock's conduct before the closing. Glasscock is entitled to indemnity from Extermitech for any recovery against Glasscock under the breach-of-contract or breach-of-warranties claims if the McGlaughlins develop and prevail on a cognizable theory of recovery against Glasscock arising from Extermitech's failure to perform obligations under the termite warranties after the closing. This action is remanded to the trial court for further proceedings consistent with this opinion.[10]
AFFIRMED IN PART; REVERSED
IN PART; AND REMANDED.
LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
SEE, HARWOOD, and WOODALL, JJ., concur in the result.
[2] The record does not contain any document reflecting the precise date of the closing. The purchase contract stated that closing would occur on or about November 20, 2001. The first amended complaint reflects that the McGlaughlins were apprised of the transfer of the assets of Glasscock, Inc., by January 2002.
[3] The McGlaughlins' fraud claim alleged that, between 1996 and 2001, the defendants misrepresented (i) that "they were properly inspecting and treating the termites, yet failed to do so," and (ii) that "the house had been properly inspected and treated when in fact, it had not."
[4] The words "indemnify," "indemnity," or similar words do not appear in the provision under which Extermitech assumed "full responsibility and liability under termite warranties." Nonetheless, the parties have characterized the two sentences in the operative provision on pages 2-3 of the purchase contract as "cross-indemnity" clauses. We agree that the assumption-of-liability provision under review here is an indemnification provision.
[5] In support of its motion for a summary judgment, Glasscock submitted an affidavit stating that Glasscock would not have sold the assets of Glasscock, Inc., and gotten out of the pest-control business unless Extermitech had assumed complete responsibility for all liabilities arising from Glasscock's pre-closing operations.
[6] The trial court did not include findings in its summary-judgment order. Although not expressly stated in that order, statements by the trial court in a hearing on Glasscock's summary-judgment motion indicate that the trial court did not consider the indemnity provision to be ambiguous.
[7] Extermitech paid $285,000 for the purchase of Glasscock's assets. The McGlaughlins claim they will incur expenses of $150,000-$175,000 to repair the termite damage to their house.
[8] The purchaser of assets of a business generally does not assume the liabilities and debts arising from the seller's use of those assets and pre-transfer operations. As discussed inBrown v. Economy Baler Co., 599 So.2d 1 (Ala. 1992), one of the exceptions to this rule is where "`there is anexpress agreement [for the transferee] to assume the obligations of the transferor.'" 599 So.2d at 3 (quotingAndrews v. John E. Smith's Sons Co., 369 So.2d 781, 785
(Ala. 1979)) (emphasis added). The parties to a sale of business assets have freedom of contract to enter into agreements under which the purchaser can indemnify the seller for liabilities arising from seller's pre-transfer operations. Here we resolve the ambiguity in the agreement that purportedly transferred pre-closing liabilities to Extermitech against the seller. This result is consistent with the general rule that, absent an "express" understanding, the purchaser of business assets does not assume responsibility for liabilities arising from the seller's use of assets or its pre-transfer operations.
[9] Extermitech makes several additional arguments to support its position that the trial court erred when it ordered Extermitech to indemnify Glasscock for Glasscock's pre-closing conduct. Extermitech argues that an indemnity agreement is not enforceable under Alabama law without a clear expression of intent that the indemnitee be indemnified for its own wrongs. Further, Extermitech argues that an agreement requiring it to indemnify Glasscock for Glasscock's fraud or other intentional acts is void as a matter of public policy. In view of our construction of the indemnity provision, we need not consider these arguments.
Further, Extermitech asks us to hold that it is not obligated to indemnify Glasscock for any damages the McGlaughlins allegedly might recover for breach of a builder warranty in the certificate. That builder warranty provides that Glasscock, at no cost to the owner, would repair all construction damage caused by active subterranean termites within the one-year builder-warranty period. Although the certificate was issued in 1996 and Extermitech is not responsible for damages caused by Glasscock's conduct occurring before the closing, the McGlaughlins assert claims of breach of warranty in count IV, and the builder warranty is one of the termite warranties assumed by Extermitech at the closing. We decline to determine the duration of the builder warranty or to hold that it is inapplicable to Extermitech under any set of facts. Whether Glasscock or Extermitech have any obligations to the McGlaughlins under the builder warranty is a matter that initially should be determined in the trial court subject to the interpretation given the purchase contract herein.
[10] Extermitech is not obligated under the indemnity provision to reimburse Glasscock for attorney fees incurred by Glasscock with respect to defense of claims in the underlying action that arise from Glasscock's conduct occurring before the closing.