# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 29, 2009

Charles R. Fulbruge III
Clerk

No. 08-30528

TEXACO EXPLORATION AND PRODUCTION INC; MARATHON OIL
COMPANY

Plaintiffs-Appellants

v.

AMCLYDE ENGINEERED PRODUCTS COMPANY INC; AMCLYDE
ENGINEERED PRODUCTS INC

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:99-CV-3623

Before GARWOOD, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

On December 3, 1998, a crane failed during the construction of the
Compliant Tower at the Petronius oil and gas production facility ("Petronius
Project"), causing the South Deck Module ("SDM") to fall into the ocean.
Plaintiffs-Appellants Texaco Exploration and Production, Inc. and Marathon Oil
Company (collectively "Texaco") initiated suit against several entities to recover

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

damages caused by the SDM's loss; specifically, Texaco sued to recover consequential damages from Defendants-Appellees AmClyde Engineered Products Company, Inc. and AmClyde Engineered Products, Inc. (collectively "AmClyde"). The district court found that AmCylde was a "subcontractor" for purposes of the relevant contract. Because the contract limited subcontractor liability, Texaco could not recover against AmClyde for any consequential damages it sustained due to AmClyde's alleged negligence on the Petronius Project. Texaco appeals the district court's ruling. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Texaco hired contractor J. Ray McDermott, Inc. ("McDermott" or "Contractor") to construct the Compliant Tower for the Petronius Project. The Compliant Tower is a platform that is fixed permanently to the Outer Continental Shelf adjacent to the Alabama shore and is designed to flex with the forces of wave, wind, and current. During the installation of the SDM to the Tower, a main load line on a crane failed, causing the SDM to fall into the Gulf of Mexico. The failure resulted in a complete loss of the SDM and a fifteen-month delay to the Project.

Texaco and McDermott entered into a contract (the "Petronius Contract" or "Contract") relating to the construction of the Compliant Tower and the installation of two modules on the Tower. *See Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co. (Texaco II)*, 448 F.3d 760, 765–66 (5th Cir. 2006) (providing further detail on the factual basis of this suit). The Petronius Contract contains a clause providing that a valid subcontractor on the Petronius Project is not liable for any consequential damages. Specifically, Section 29 of the Petronius Contract states,

> To the extent not covered by Builder's Risk and Difference in
> Conditions insurance and notwithstanding any other provisions of

this Agreement, Texaco and Contractor waive and release any claim against the other for consequential damages, however and whenever arising under this Agreement or as a result of or in connection with the Work and whether based on negligence, unseaworthiness, breach of warranty, breach of contract, strict liability or otherwise.

Section 4 of the Petronius Contract defines "Contractor" as follows:

"Contractor" means Contractor, and its parents, subsidiaries, and affiliates, the agents, employees and subcontractors of any of them.

Finally, Section 14 of the Contract, in pertinent part, addresses "subcontractors":

If Contractor shall cause any part of the Work hereunder to be performed by a subcontractor, the provisions of this Agreement shall apply to such subcontractor and his or its employees in all respects as if he were employees of Contractor, and Contractor shall be liable for the Work of the subcontractor accordingly. No subcontract shall be made without the prior written approval of Texaco of both the subcontract and the subcontractor (such approval shall not be unreasonably withheld), but no such approval shall affect the provisions of this Agreement.

In addition to the Petronius Contract, McDermott had a pre-existing contract with AmClyde, which provided that AmClyde was the subcontractor on all work that McDermott was obligated to perform for third parties. It is undisputed that AmClyde designed a deep water lowering system for use on the underwater installation of the Compliant Tower's support structure and rendered a technical analysis of the peculiarities of the lift modules used on the Petronius Project.

## B. Procedural Background

This is the third time that this court has addressed questions stemming from the loss of the SDM. *See Texaco II*, 448 F.3d at 776–77 (recounting the procedural history of the case up to its consideration of the issues in May 2006); *see also Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co. (Texaco I)*, 243 F.3d 906 (5th Cir. 2001). This court in *Texaco II* addressed, *inter alia*, whether the district court correctly concluded that AmClyde was a

"subcontractor" under the terms of the Builder's Risk Policy ("the Policy"), an insurance policy covering the Petronius Project. *Id*. at 766. We conducted a two-part inquiry. We first held that AmClyde was a subcontractor as the term was commonly understood under either Texas or Louisiana law. *Id*. at 778–79. We found that a subcontractor was "'one who takes a portion of a contract from the principal contractor or another subcontractor,'" *id*. at 778 (citation omitted), and that the work AmClyde performed "in designing the lowering system used to install the support structure of the compliant tower and in calculating the hook eccentricity, a requisite part of the lifts, was integral to and required for compliant tower construction," *id*. at 779. Accordingly, we held that the district court correctly concluded that AmClyde was a "subcontractor" because it performed work assigned to the Contractor under the Petronius Contract. *Id*. We also considered whether the Policy altered the common understanding of the term "subcontractor," and held that it did not. *Id*.

After remand, AmClyde sought summary judgment, asserting that the prior panel's holding in *Texaco II*—that AmClyde was a "subcontractor"—meant that AmClyde was entitled to a waiver of consequential damages. The district court determined that *Texaco II* did not cover the instant dispute because the issue addressed therein related solely to the definition of "subcontractor" under the Policy, not the Petronius Contract. That is, it found that we did not decide whether AmClyde was a "subcontractor" under the Petronius Contract. Nevertheless, the district court concluded that AmClyde was a "subcontractor" under the terms of the Petronius Contract and was therefore entitled to a waiver of consequential damages. First, the court concluded that under Alabama's general definition of "subcontractor," AmClyde was a subcontractor on the Petronius Project.[1] Next, the district court determined that the Petronius

---

[1] The district court found and the parties agree that Alabama law applies to all substantive legal issues.

Contract may have introduced some ambiguity into the contract and its definition of the term "subcontractor." The district court found, however, that Section 14's declaration that "no such approval shall affect the provisions of this agreement" evinced an intent by the parties to qualify any potential inconsistency between Section 14's written approval requirement and Section 29's waiver provision. The court interpreted this clause to mean that the written approval process required by Section 14 did not alter the parties' understanding of "subcontractor" as defined elsewhere in the contract. The district court accordingly granted summary judgment to AmClyde.

Texaco obtained a final appealable order pursuant to Federal Rule of Civil Procedure 54(b) and this appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291. The district court had subject matter jurisdiction over the case under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356a. *See Texaco II*, 448 F.3d at 770.

This court reviews a district court's order granting summary judgment de novo. *Morris v. Equifax Info. Servs., L.L.C.*, 457 F.3d 460, 464 (5th Cir. 2006). Summary judgment is appropriate when, after considering the pleadings, the discovery and disclosure materials, and any affidavits, "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Bulko v. Morgan Stanley DW, Inc.*, 450 F.3d 622, 624 (5th Cir. 2006). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But, "when a motion for summary judgment is made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response

5

must . . . set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e).

## III. DISCUSSION

Texaco concedes that if AmClyde is a "subcontractor" under the terms of the Petronius Contract, then Section 29 of the Contract bars any claims it may have against AmClyde for consequential damages arising from AmClyde's alleged negligence. Texaco asserts two reasons why AmClyde is not a "subcontractor": (1) AmClyde did not perform any work covered by the Petronius Contract, and therefore was not a "subcontractor" as defined under Alabama law; and (2) Section 14 of the Petronius Contract limited the common understanding of the term "subcontractor" to those who obtained written approval from Texaco.

### A. Alabama Contract Law: "Subcontractor"

Texaco argues that AmClyde is not a subcontractor under Alabama law because the work that AmClyde performed was for McDermott's general use and was not covered by the Petronius Contract. "Stated simply, a subcontractor is one who 'perform[s] some portion of the contract of the general contractor.'" *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So. 2d 18, 23 (Ala. 2002) (citing *Pinecrest Apartments, Ltd. v. R.P. McDavid Co.*, 535 So. 2d 126, 128 (Ala. 1988) (alteration in original)). Under Alabama law, the common understanding of the term "subcontractor" is,

> One who takes [a] portion of a contract from [the] principal contractor or another subcontractor. One who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance. One who takes from the principal or prime contractor a specific part of the work undertaken by the principal contractor.

*H.R.H. Metals*, 833 So. 2d at 23–24 (internal quotation marks and citations omitted).

6

The Petronius Contract detailed the scope of the work that McDermott was expected to perform on the Petronius Project. The Contract required McDermott to

> [f]urnish and pay for all labor, office and fabrication facilities, equipment, materials and supplies and to perform and complete all work and services required or necessary, in accordance with this Agreement for the engineering, design, drafting, fabrication, and installation of piles, template base, and top section for a compliant tower, together with the installation of topsides and Ensco, (formerly Dual) 29 or comparable drilling rig at Viosca Knoll Block 786 [also known as the Petronius Project], all as set forth more fully in Exhibit A—Scope of Work.

That is, the Contract required McDermott, *inter alia*, to provide all necessary services to engineer, design, and install the Compliant Tower. The record reveals that AmClyde performed work integral to McDermott's obligations under the Contract. Specifically, AmClyde designed the deep water lowering system for use on the underwater installation of the tower support structure for the Petronius Project and provided specific technical advice on the main hook loading for the lifts of the North Deck Module and the SDM.

Because the work AmClyde performed designing the deep water lowering system and its provision of technical advice was work that McDermott was assigned to perform under the Petronius Contract, this evidence suggests that, as a matter of Alabama law, AmClyde was a "subcontractor" on the Petronius Project. Texaco was given the opportunity under Federal Rule of Civil Procedure 56(e) to "set out specific facts showing a genuine issue for trial." Texaco, however, only provided evidence that McDermott intended to use the deep water lowering system on other projects; it has provided no evidence to support its allegation that AmClyde's technical advice was for McDermott's general use. Its failure to do so is fatal to its argument. *See* FED. R. CIV. P. 56(e) (requiring that a party opposing summary judgment set forth evidence creating a genuine issue

7

of material fact to survive summary judgment).  Texaco has thus failed to create a genuine issue of material fact that AmClyde was not a subcontractor under Alabama law.  *See H.R.H. Metals*, 833 So. 2d at 23.

## B.  Section 14

Having concluded that AmClyde was a "subcontractor" under Alabama law, we next consider whether the Petronius Contract alters the common understanding of the term "subcontractor."  Texaco asserts that the Petronius Contract contained an additional requirement to be a "subcontractor" under the Contract; specifically, it argues that the Contract limited the term to those who complied with the written approval process outlined in Section 14.  It is undisputed that McDermott did not receive Texaco's written approval of the subcontract between AmClyde and McDermott.

"Alabama adheres to the general rule of contract law, as stated by the Alabama Supreme Court on many occasions, that when the parties reduce their agreements to writing, the writing—in the absence of mistake or fraud or ambiguity—is the sole expositor of the transaction and the intention of the parties."  *Hinds v. Plantation Pipe Line Co.*, 455 F.2d 902, 906 (5th Cir. 1972) (emphasis, internal quotation marks, and citations omitted); *see United Land Corp. v. Drummond Co.*, 990 So. 2d 858, 866 (Ala. 2008) ("[I]t is axiomatic that [c]ontract interpretation is guided by the intent of the parties, which, absent ambiguity, is evidenced by the plain language of the contract." (second alteration in original, internal quotation marks and citations omitted)).  If a court finds that the contract is not ambiguous, then its meaning is a question for the court and "no jury question is presented."  *Jones v. Chaney & James Constr. Co.*, 399 F.2d 84, 88 (5th Cir. 1968).  "The interpretation of an ambiguous provision in a contract is a question of law for the court when, applying rules of contract construction, the court may resolve the ambiguity by staying within the four corners of the contract."  *Exxon Mobil Corp. v. Ala. Dep't of Conservation &*

*Natural Res.*, 986 So. 2d 1093, 1101 (Ala. 2007). "If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise" that must be resolved by the jury. *Extermitech, Inc. v. Glasscock, Inc.*, 951 So. 2d 689, 695 (Ala. 2006) (emphasis omitted). Further, "if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed." *Id.* at 694 (internal quotation marks and citations omitted).

The plain language of the contract is the best measure of the parties' intent. *See United Land*, 990 So. 2d at 866; *see also Extermitech*, 951 So. 2d at 694 ("Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning."). Despite Texaco's assertions, the Contract does not explicitly limit "subcontractors" to "subcontractors who have complied with the written approval provision in Section 14." In the three key provisions quoted above (Sections 4, 14, and 29), the Contract does not contain any qualifying language limiting the term "subcontractors." Absent qualifying language, we must interpret the term in light of its common understanding under Alabama law.

In addition, Section 4 of the Petronius Contract defines the term "Contractor" to include "subcontractors." Section 4 does not contain any language qualifying the term "subcontractor," thus indicating that we should interpret the term consistent with its common understanding. Texaco, however, suggests that Section 14, a latter clause, was meant to qualify the term "subcontractor" as it appears in Section 4. Specifically, Texaco argues that the phrase "[n]o subcontract shall be made without the prior written approval of Texaco of both the subcontract and the subcontractor" qualifies the term "subcontractor" from Section 4. But Section 14 does not contain a plain statement expressing the parties' intent to qualify the former clause with the latter one. This phrase says that a "subcontract" shall not be made, but it does

not limit the term "subcontractor" in any way. Accordingly, Alabama law dictates that Section 14 does not limit Section 4's terms, as Section 14 does not contain an express statement to that effect. *See Extermitech*, 951 So. 2d at 694.

Texaco incorrectly assumes that AmClyde's interpretation—that the parties intended the term to reflect its common understanding under Alabama law—renders Section 14 meaningless. There are numerous justifications for the written approval process that have nothing to do with subcontractor liability. For one, the approval process provides Texaco with notice of the subcontractors for whose work McDermott, as the Contractor, was liable under the terms of the Contract. The approval process also provides Texaco with the ability to verify that McDermott was not entering into subcontracts with subcontractors known by Texaco to perform poorly. Texaco would have the option to prevent poorly performing subcontractors from engaging in work on its project by withholding its approval.

In addition, Texaco benefits from a broad understanding of the term. The Contract requires "subcontractors" to waive any potential claim for consequential damages arising from Texaco's negligence. Texaco sure would not argue that the parties intended that McDermott's failure to obtain written approval of a subcontract would alter Texaco's ability to assert the Section 29 waiver provision in the event that Texaco was the tortfeasor. In addition, under Section 14, McDermott is liable for the work of its subcontractor. If the term is narrowly confined to those with written approval from Texaco, then McDermott's failure to obtain written approval from Texaco would mean that McDermott was no longer "liable for the [w]ork of the subcontractor." The parties could not have intended such nonsensical outcomes.

Finally, Texaco has a remedy for McDermott's failure to comply with the written approval process: it may pursue an action against McDermott for breach of the contract.

"[T]he court will presume that the parties intended what they stated and will enforce the contract as written." *Extermitech*, 951 So. 2d at 694. As written, the Contract does not narrow the term "subcontractor" beyond its common understanding under Alabama law. Accordingly, AmClyde was a "subcontractor" and is entitled to the waiver against consequential damages contained in Section 29.

## IV. CONCLUSION

Texaco has failed to create a genuine issue of material fact as to whether AmClyde was a subcontractor under Alabama law. Because nothing in the Petronius Contract alters the common understanding of the term "subcontractor," AmClyde is entitled to receive the benefit of the waiver provision in the Contract. Accordingly, we AFFIRM the district court's ruling.

AFFIRMED.