THOMAS, Judge.
 

 On March 9, 2005, David Carroll sued his former employer, LJC Defense Contracting, Inc. (“LJC”), and Laura Johnston Clark, its president and sole shareholder, alleging breach-of-contract, quantum me-ruit, unjust-enrichment, and promissory-fraud claims and seeking an accounting. On May 2, 2005, LJC and Clark answered and denied liability. Following discovery, LJC and Clark moved for a summary judgment on March 10, 2008, attaching depositions and other evidentiary materials in support of their motion. Carroll filed a response in opposition to the summary-judgment motion on May 8, 2008, also attaching depositions and other evi-dentiary materials in support of his response. On May 28, 2008, the trial court entered a summary judgment in favor of LJC and Clark on all claims.
 

 Carroll timely appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. On appeal, Carroll argues that he presented substantial evidence creating a genuine issue of material fact with respect to his first four claims. He makes no argument with respect to the trial court’s denial of his request for an accounting.
 

 Factual Background
 

 Carroll is a roofing contractor. LJC is a general construction contractor whose principal place of business is in Dothan. By virtue of the fact that it is owned and operated by a woman, LJC is entitled to minority “set-aside” preferences pursuant to § 8(a) of the Small Business Act,
 
 see
 
 15 U.S.C. § 637(a)(1994). In August 2003, LJC’s president, Clark, who was interested in expanding LJC’s construction-contracting opportunities beyond § 8(a) minority set-aside work, talked with Carroll about establishing a roofing division within LJC.
 

 LJC’s construction projects had usually included roofing, but LJC had typically
 
 *451
 
 hired subcontractors to do the roofing installations. Clark spoke with Carroll about establishing an in-house roofing capability within LJC so that LJC could eliminate its reliance upon subcontractors for roofing work, reduce overhead, and thereby make a greater profit.
 

 During their employment discussions, Carroll told Clark that he could generate for LJC roofing work valued from $1 million to $1.5 million per year. He informed Clark that he was
 

 “able to be a project manager, which included finding work, bidding the work, doing quantitative take-offs, which is part of the bid process. Reading through specifications and interpreting specifications. Putting together a proposal package or a bid package, and then overseeing the job; materials, ordering, billing. [He said that he] could take a job from one end to the other.”
 

 Clark testified that those capabilities were crucial to her. She told Carroll that she did not want him to use either subcontractors or LJC’s construction crew to do the roofing work he brought to LJC. Clark testified:
 

 “[W]hen he came on if he was going to use a subcontractor, then we didn’t need David Carroll. ... We had good roofing subcontractors. The purpose for him to come on [was that roofing subcontractors] had thirty to forty percent overhead, and we were going to cut out that part and let him do it and have his own crews. But if we used subcontractors, then we didn’t need David Carroll. We were doing that anyway.”
 

 Carroll assured Clark that he had his own roofing crew. Clark explained to Carroll that, if he were to be employed by LJC, his roofing work was to be a separate, self-sustaining enterprise, with Carroll’s bonus, if any, payable from the net profits the enterprise generated. Clark testified:
 

 “I told him during [our employment discussions] ... that the definition of ‘brought in’ [was that] he was to bring in the work, bid the work, not use any LJC resources, and I stressed that repeatedly. He was to do all the submittals, billings, close-out documents, anything to take the job from start to finish.”
 

 Carroll agreed that his job description was to
 

 “locate projects, go through specifications, read and interpret specifications, put together [an] estimate for the solicitation, [and] bid the solicitation ... oversee the project to the end if [LJC] were awarded the job, which included material procurement, making sure labor force was there, and producing or billing any close-out documents.”
 

 Carroll said that he and Clark did not discuss what would happen if he managed only part of a project, but he acknowledged that, in order to receive the profit-sharing that, he said, was promised him, he would be “personally responsible for everything from start to finish.” The parties agreed that Carroll’s employment would include a six-month probationary period, after which, if Carroll’s roofing operation were profitable, the parties would consider setting up a legal entity separate from LJC as the roofing component of the construction company.
 

 Carroll explained to Clark that, although he was dissatisfied with his current employer, he was obligated to complete several projects for that employer and could not devote all his time to LJC for several months. In September 2003, Clark and Carroll entered into an oral employment agreement in the presence of Allan Buchanan, LJC’s vice president for operations. The parties agreed that LJC would employ Carroll at a weekly salary plus
 
 *452
 
 “25% of the net profits from the roofing work he brought in to LJC.”
 

 In February 2004, Carroll informed Buchanan that he needed new tires for his truck. Questioning whether truck maintenance was included in Carroll’s employment agreement, Buchanan asked Carroll to write out his understanding of the employment agreement. Carroll wrote:
 

 “Employment Agreement
 

 “1) $750-/wk thru end of year ’03, 4 days /wk $900 @ ’04, 5 days/wk
 

 “2) 1-1.5 million/yr annual sales
 

 “3) Trial pd.= 6 months — reevaluate @ 6 mo. period
 

 “4) 25% of net profit to be given as bonus
 

 “5) [Overhead] not discussed in detail, but general idea was ask [clerical staff] their time required, with set monthly ‘fee.’
 

 “6) Truck would be discussed @ later time.”
 

 Upon seeing what Carroll wrote, Buchanan acknowledged that his recollection of the agreement was the same as Carroll’s.
 

 Clark met with Carroll at the end of his six-month probationary period in March 2004, and she expressed her dissatisfaction with Carroll’s performance. Clark explained that, instead of using his own crews to perform the work, Carroll was employing labor subcontractors, some of whom did not show up for work and many of whom did not have workers’ compensation insurance, which, Clark said, was against LJC policy. Clark told Carroll she was concerned that he was “messing up LJC’s good name.” Claiming that the projects he was managing had not progressed far enough to be properly evaluated, Carroll asked Clark to give him a chance to prove himself. Clark agreed to extend Carroll’s probationary period until December 2004.
 

 The parties differed with respect to whether their oral agreement contemplated that Carroll would be able earn the 25% profit-sharing bonus during his six-month probationary period. Clark testified that she understood the agreement to be that Carroll would be entitled to no profit sharing until the six-month probationary period had ended
 
 and
 
 the parties had formed the separate legal entity that they had discussed. Carroll stated that he understood he would receive 25% of the net profit from whatever roofing work he brought to LJC, even during the six-month probationary period and irrespective of whether the parties ever formed a separate legal entity.
 

 Carroll testified that in the year following his being hired by LJC he had generated and managed approximately $1.5 million in roofing work for LJC, consisting of projects at Fort Rucker, Maxwell Air Force Base, and two secondary schools in Florida. Carroll was not paid, and he has not sought in the lawsuit that is the subject of this appeal, a bonus for those projects. Documentary evidence submitted in support of LJC and Clark’s summary-judgment motion indicated that LJC suffered a net loss on those projects.
 

 The parties’ main disagreement centers on whether Carroll’s employment agreement included 25% profit sharing only for “permanent” roofing installations or whether it also included 25% profit sharing on “temporary” roofing installations. Specifically, the parties disagree about whether Carroll is entitled to share in the approximately $40 million profit that LJC realized from “Operation Blue Roof,” the Federal Emergency Management Agency (“FEMA”) response to four hurricanes— Charley, Frances, Ivan, and Jeanne — that struck Florida and the Gulf Coast in rapid
 
 *453
 
 succession during the late summer and fall of 2004.
 

 Following each of the four hurricanes, the United States Army Corps of Engineers solicited contractors’ bids for installation of temporary blue plastic sheeting on homes and other structures that sustained roof damage during the storm. After Hurricane Charley struck the west coast of Florida in August 2004, Allan Buchanan was browsing federal construction-contract opportunities on the Internet when he came across a solicitation for bids on emergency roof repairs in the aftermath of the hurricane. He passed the solicitation on to Carroll, suggesting that it might be a good opportunity for LJC. Carroll reviewed the solicitation and determined that LJC should bid on the project. Soon thereafter, the entire LJC management team began formulating a bid and they arrived at a bid of $.27 per square foot. LJC was the low bidder and was awarded the contract for the roofing work incident to Hurricane Charley.
 

 When LJC personnel arrived at the site of the destruction in Punta Gorda, Florida, however, it soon became apparent that the bid was too low and LJC would lose money on the contract. Initially, Clark sent Carroll to Florida to be the project manager for the Hurricane Charley roof repairs, but she later asked Buchanan to take over as the project manager because, she said, “I felt like Allan [Buchanan] was the only one at that time that could go down and manage that project at twenty-seven cents, and make it where my company didn’t go under.” Carroll testified that Clark told him she was giving the project to Buchanan because he was the one who had “found” the project. Ultimately, the Corps of Engineers recognized the logistical difficulties inherent in performing the contract at $.27 per square foot and established a new contract price of $1.99 per square foot, a price at which LJC made a substantial profit.
 

 LJC was also awarded blue-roof contracts following Hurricanes Frances, Ivan, and Jeanne. Carroll testified that, after those three hurricanes, he was the one who had located the bid solicitations for emergency roofing repairs, and he assumed that the roofing projects incident to those hurricanes would be “his” because he had found them. Instead, Clark named Buchanan the project manager for Hurricanes Frances and Jeanne. Clark asked Carroll to be the project manager for Hurricane Ivan, offering to double his weekly salary and to pay him a management fee of $25,000. Carroll accepted the offer, and the parties reduced their agreement to the following writing signed by Carroll and Clark:
 

 “Management Agreement
 

 “I, David Carroll, agree to accept a management fee of $25,000.00 less taxes for the temporary roof repairs of Hurricane Ivan contracted through LJC Defense Contracting.”
 

 The evidence was undisputed that the blue-roof contracts presented LJC with enormous logistical challenges, which included amassing, upon very short notice, the tools, materials, and workers needed to make temporary roof repairs to thousands of homes in areas without electrical power, food, water, and housing for laborers. For example, LJC was required to begin work in Punta Gorda, Florida, within 24 hours of being notified that it was the low bidder for the blue-roof contract after Hurricane Charley. For Hurricanes Frances, Ivan, and Jeanne — the three hurricanes that struck in September 2004 — LJC was awarded blue-roof contracts for approximately 25,000 homes in 3 different geographical areas.
 

 The evidence was also undisputed that, for each hurricane blue-roof project, LJC’s
 
 *454
 
 response — formulating its bid, locating tools and equipment, mobilizing a work force, arranging food and housing for laborers, obtaining rights-of-entry from property owners, overseeing all the work, and communicating with the Corps of Engineers — was a massive undertaking requiring a group effort by all LJC’s management personnel, which, in addition to Carroll, included Laura Clark, her husband Colby Clark, vice president Buchanan, senior project manager Gene Oden, field-operations manager Andy Nelson, and logistics manager Gerald Morris.
 

 Carroll admits that he did not find, generate, or “bring in” to LJC the Hurricane Charley blue-roof project. He claims, however, that he obtained the blue-roof projects incident to Hurricanes Frances, Ivan, and Jeanne by locating the solicitations for bids on the Internet. He also claims that he substantially performed his contractual obligations with respect to managing those projects so as to entitle him to a 25% share of the profits. Carroll testified that in January 2005, he asked Clark when they were going to be able to “sit down and come to some agreement about the [profit-sharing] agreement that [they] had in place as far as storm work and work over the previous year.” Clark stated that, “as far as she was concerned it had already been taken care of by a manager’s-fee agreement that Carroll had signed to go to Pensacola [to manage the Hurricane Ivan project].”
 

 Standard of Review
 

 Appellate review of a summary judgment is de novo.
 
 Ex parte Ballew,
 
 771 So.2d 1040 (Ala.2000). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3);
 
 see Lee v. City of Gadsden,
 
 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ”
 
 Lee,
 
 592 So.2d at 1038 (footnote omitted). “[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989);
 
 see
 
 § 12-21-12(d), Ala.Code 1975.
 

 The Contract Claim
 

 The elements of a valid contract are “ ‘an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.’ ”
 
 Ex parte Grant,
 
 711 So.2d 464, 465 (Ala.1997) (quoting
 
 Strength v. Alabama Dep’t of Fin., Div. of Risk Mgmt.,
 
 622 So.2d 1283, 1289 (Ala.1993)). LJC and Clark maintain that the emergency roof repairs that LJC made to hurricane-damaged structures were temporary, as opposed to permanent, roofing installations and that the parties intended for Carroll to share only in the profits of permanent roofing installations. Carroll, on the other hand, argues that the contract was ambiguous with respect to the meaning of the term “roofing work.” He maintains that he presented substantial evidence creating a genuine issue of material fact as to whether the parties intended to include temporary roofing installations in their oral agreement concerning his sharing in the profit of “roofing work.” Accordingly, Carroll contends that the trial court erred by entering a summary judgment in favor of LJC and Clark because,
 
 *455
 
 he says, the meaning of the term “roofing work” is a jury question.
 

 Whether a contract is ambiguous is a question of law for the trial court to decide, a decision that we review de novo.
 
 See FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc.,
 
 914 So.2d 344, 357 (Ala.2005). A contract is ambiguous if it is “reasonably susceptible of more than one meaning.”
 
 Id.
 
 “Roofing work” is a general term that includes the specific subcategories of “permanent” roofing work and “temporary” roofing work, and it is, arguably, ambiguous by virtue of its failure to specify the category or categories to which it refers.
 
 Compare American Indem. Co. v. Davis,
 
 260 F.2d 440, 442 (5th Cir.1958) (in determining whether joint ownership of an automobile by insured and his son qualified as “ownership” within automobile liability insurance policy, the court held that the term “ownership” was ambiguous because “ ‘ownership’ in its literal sense includes joint as well as sole ‘belonging,’ [and] the use of the more general term ‘ownership’ comprehends the qualified terms ‘sole’ and ‘joint’ ownership”).
 

 Carroll may be correct, therefore, that the contract is ambiguous because the term “roofing work” is reasonably susceptible of more than one meaning, but he is mistaken in assuming that, when a court determines that a contract is ambiguous, it is then up to the finder of fact to resolve the ambiguity.
 
 See Extermitech, Inc. v. Glasscock, Inc.,
 
 951 So.2d 689, 694-95 (Ala.2006). Instead,
 
 the trial court,
 
 in determining the meaning of the contract, first “ ‘ “must employ established rules of contract construction to resolve the ambiguity.” ’ ”
 
 Id.
 
 at 694 (quoting
 
 Alfa Life Ins. Corp. v. Johnson,
 
 822 So.2d 400, 405 (Ala.2001), quoting in turn
 
 Voyager Life Ins. Co. v. Whitson,
 
 703 So.2d 944, 948 (Ala.1997)) (emphasis omitted).
 
 See also FabArc Steel Supply,
 
 914 So.2d at 358; Vesta
 
 Fire Ins. Corp. v. Liberty Nat’l Life Ins. Co.,
 
 893 So.2d 395, 403-04 (Ala.Civ.App.2003). If, after applying established rules of contract construction, the trial court is unable to resolve the ambiguity and factual issues arise, only then does “the resolution of the ambiguity become[ ] a task for the jury.”
 
 Vesta Fire Ins. Corp. v. Liberty Nat’l Life Ins. Co.,
 
 893 So.2d at 404 (quoting
 
 Alfa Life Ins. Corp. v. Johnson,
 
 822 So.2d at 405) (emphasis added).
 

 Alabama courts have consistently held that if factual disputes arise with respect to matters such as
 

 “[the] facts and circumstances leading up to and attending [the] execution [of the contract], [the] relation and condition of [the] parties, [the] nature and situation of [the] subject matter, and [the] apparent purpose of making the contract,”
 

 then such disputes should be resolved by the finder of fact.
 
 Pacific Ins. Co. v. Wilbanks,
 
 283 Ala. 1, 5, 214 So.2d 279, 283 (1968). If, however, there is no dispute concerning such factual questions, then the trial court should determine the meaning of the contract in light of the undisputed facts.
 
 See Flagg-Utica Corp. v. City of Florence,
 
 275 Ala. 475, 480, 156 So.2d 338, 342 (1963).
 

 In the present case, the undisputed facts indicate that the parties mutually assented to the following essential contract terms: that Clark would employ Carroll to establish a separate, self-sufficient roofing division of LJC; that Carroll’s job would be to find, bid, manage, oversee, and bill for the roofing work he generated without using LJC labor or management resources; that Carroll would be “personally responsible for
 
 everything
 
 [on the roofing projects he brought to LJC] from start to finish”; that Carroll would be paid a weekly salary; and that if Carroll’s roofing projects were
 
 *456
 
 profitable, he would receive 25% of the net profits from the projects as a bonus.
 

 Because the parties’ contract was made one year before the first of four hurricanes struck and bids were solicited on the blue-roof projects, and because none of the parties had ever worked on a blue-roof project before, the parties undoubtedly did not contemplate the blue-roof hurricane roofing contracts that LJC was awarded one year later. Alabama caselaw indicates that courts “will not stretch the language of a contract to apply to matters that were not contemplated by the parties when they entered the contract.”
 
 Koullas v. Ramsey,
 
 683 So.2d 415, 417 (Ala.1996) (citing
 
 Seaboard Coast Line R.R. v. Trailer Train Co.,
 
 690 F.2d 1343 (11th Cir.1982)). Despite the parties’ having couched their disagreement about the meaning of “roofing work” in terms of the distinction between “permanent” roofing projects and “temporary” roofing projects, the trial court was authorized to determine that what made the blue-roof projects beyond the contemplation of the parties— and therefore not a matter to which they mutually assented that Carroll should receive a 25% share of the profits — was the size and scope of the projects, not the classification of the roofing work as “temporary.”
 

 The evidentiary material in the record before us includes the depositions of Carroll, Laura Clark, Colby Clark, Buchanan, Oden, and Morris, all of whom agreed that the blue-roof projects were massive undertakings that presented enormous logistical challenges, that involved dozens of subcontractors, that were not overseen “from beginning to end” by any one person, and that required a joint effort by all LJC’s management team. In contrast, Carroll acknowledged in deposition testimony that his employment contract dictated that, in order to receive the profit-sharing that, he said, was promised him, he would be have to “bring in” or locate the project and be solely responsible for “everything from start to finish.” The facts and circumstances leading up to and attending the execution of Carroll’s employment agreement demonstrate that the parties intended that Carroll would be hired to manage án autonomous, self-sustaining roofing division of LJC — an in-house operation that would neither rely on roofing subcontractors nor use other LJC personnel and resources. However, LJC’s performance of the blue-roof contracts required, of necessity, the employment of numerous subcontractors, the use of LJC resources, and reliance on the skills of all its management personnel. Carroll admitted as much when he testified:
 

 “There’s no way that one person, at least up front, can do everything that’s got to be done. Somebody has to be able to help them. And I realize that. When you get involved in — especially in this kind of storm work, catastrophic storm work, it’s not a one- or a two- or a three- or a five-man job, even from a logistical standpoint.”
 

 A trial court may consider the parties’ dealings after the making of a contract because the dealings “are important as going to show [the] construction [of the contract] by [the] parties themselves while friendly.”
 
 Flagg-Utica Corp. v. City of Florence,
 
 275 Ala. at 480, 156 So.2d at 343 (citing
 
 McGowin Lumber & Export Co. v. Camp Lumber Co.,
 
 16 Ala.App. 283, 77 So. 433 (1917)). Carroll argues that Clark’s conduct during the Hurricane Charley project indicates that she recognized that the profit-sharing provision in his employment agreement encompassed the blue-roof projects. Carroll contends that Clark replaced him as the project manager for the Hurricane Charley project and substituted Allan Buchanan in that position because,
 
 *457
 
 he says, Clark realized that the project would be extremely profitable and Buchanan had only a 10%, rather than a 25%, profit-sharing agreement with LJC.
 

 Clark refuted that version of the events, testifying that she designated Buchanan as the project manager before the Corps of Engineers raised the contract price to $1.99 per square foot and she recognized that the project would be profitable. Clark stated that when she offered Buchanan 10% of the Hurricane Charley profits she believed the project would probably result in a loss to LJC, but she thought Buchanan was the only one in the company with the experience and ability to manage the project at the initial $.27-per-square-foot bid. Her testimony is supported by evidence indicating that Buchanan’s qualifications were superior to Carroll’s, or to any other LJC employee’s. Buchanan has a college degree in building science, had been with LJC for five years and was vice president of the company, and had previously worked as a senior project manager for Harbert International Corporation. That said, the difference between Carroll’s version of the facts and Clark’s version of the facts would indicate that the trial court erred in entering a summary judgment in favor of LJC, at least with respect to the Hurricane Charley contract, but for Carroll’s admission that he was not entitled to the profit-sharing bonus on the Hurricane Charley project because he did not “find” the project.
 

 LJC and Clark contend that the parties’ conduct during the performance of the hurricane projects indicates that there was no mutual assent to pay Carroll 25% of the blue-roof income. LJC and Clark point out that Carroll admitted in deposition testimony that, after he was “pulled off’ the Hurricane Charley project, he approached Clark and stated that he thought he was “entitled to two, three, or four percent” of the hurricane-project income. LJC and Clark also contend that Clark’s signing a written agreement to accept a double salary and a $25,000 management fee for the Hurricane Ivan project was inconsistent with the earlier oral agreement allegedly promising him 25% of the profits from that project. LJC and Clark assert either that the written agreement superseded the oral agreement, citing
 
 Cavalier Mfg., Inc. v. Clarke,
 
 862 So.2d 634, 641 (Ala.2003) (stating that “[wjhen parties execute successive agreements and the ‘two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement’ ” (quoting
 
 CMI Int'l, Inc. v. Intermet Int’l Corp.,
 
 251 Mich.App. 125, 130, 649 N.W.2d 808, 812 (2002))), or that Carroll understood when he signed the written agreement that his 25% profit-sharing agreement did not encompass the hurricane projects. We agree with LJC and Clark’s contentions regarding the management agreement Carroll signed in regard to the Hurricane Ivan project.
 

 Carroll was the project manager only for Hurricane Ivan. With respect to the blue-roof projects incident to Hurricanes Frances and Jeanne, for which Buchanan was the project manager, Carroll’s participation was no greater than any one of several other LJC managers. Accordingly, because his 25% bonus was contingent upon his being “personally responsible for everything from start to finish,” his employment agreement did not encompass those projects.
 

 The trial court did not state its reasons for entering a summary judgment in favor of LJC and Clark on the contract claim, but we conclude that the trial court correctly determined that LJC and Clark had met their burden of establishing that there was no genuine issue of material fact and
 
 *458
 
 that they were entitled to a judgment as a matter of law because Carroll’s profit-sharing agreement did not apply to the blue-roof hurricane projects.
 

 The Fraud Claim
 

 Carroll argues that Clark and LJC knowingly misrepresented to him that he would be paid a bonus amounting to 25% of the profits of the roofing work that he brought in to LJC. In
 
 Mantiply v. Mantiply,
 
 951 So.2d 638, 653 (Ala.2006), the supreme court set out the requirements for proving promissory fraud:
 

 “ ‘ “The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.” ’
 

 “Waddell & Reed, Inc. v. United Investors Life Ins. Co.,
 
 875 So.2d 1143, 1160 (Ala.2003) (quoting
 
 Padgett v. Hughes,
 
 535 So.2d 140, 142 (Ala.1988)).”
 

 Carroll has not sought a bonus for the non-hurricane roofing work he performed for LJC, and the evidence conclusively established that he is not entitled to a bonus for that work because the non-hurricane projects on which he worked resulted in a net loss to LJC. With respect to the hurricane blue-roof projects, Carroll did not present substantial evidence indicating that when the promises were made to him in 2003, and reiterated in early 2004-months before the hurricanes struck land, and FEMA and the Corps of Engineers established “Operation Blue Roof’ — that Clark and LJC intended to deceive him into believing that he would be paid a bonus for his work on the hurricane projects.
 

 “ ‘Where the misrepresentation relates to some future event, it must be shown that the person making the representation intended not to do the act promised at the time the misrepresentation was made.’ ”
 
 Hillcrest Ctr., Inc. v. Rone,
 
 711 So.2d 901, 906 (Ala.1997) (quoting
 
 Russellville Prod. Credit Ass’n v. Frost,
 
 484 So.2d 1084, 1087 (Ala.1986)). As we have previously discussed, at the time they made the employment agreement containing Carroll’s profit-sharing bonus, none of the parties contemplated the blue-roof hurricane roofing contracts that LJC was awarded one year later. Not only would it have been impossible for Clark and LJC to have intentionally misrepresented to Carroll that they would pay him a bonus for working on a then-unprecedented disaster-relief response to hurricanes that had not yet occurred, but also it would have been impossible for Carroll to have detrimentally relied on such a promise. The trial court did not err by entering a summary judgment in favor of Clark and LJC on Carroll’s fraud claim.
 

 The Quantum Meruit and Unjust-Enrichment Claims
 

 A claim of quantum meruit, or quasi-contract, is a request for equitable relief based on the principle “ ‘that if one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one who so accepts with knowledge, to pay the reasonable value of such services rendered.’”
 
 Frank Crain Auctioneers, Inc. v. Delchamps,
 
 797 So.2d 470, 474 (Ala.Civ.App.2000) (quoting
 
 Richards v.
 
 
 *459
 

 Williams,
 
 231 Ala. 450, 453, 165 So. 820, 823 (1936)).
 

 “ ‘In order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that it had a reasonable expectation of compensation for its services.
 
 Utah Foam Prods., Inc. v. Polytec, Inc.,
 
 584 So.2d 1345 (Ala.1991). However, “[w]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails.”
 
 Brannan & Guy, [P.C. v. City of Montgomery,]
 
 828 So.2d [914] at 921 [ (Ala.2002) ]. The existence of an express contract on a given subject generally excludes an implied agreement on the same subject.
 
 Vardaman v. Florence City Bd. of Educ.,
 
 544 So.2d 962 (Ala.1989).’ ”
 

 Mahoney v. Loma Alta Prop. Owners Ass’n,
 
 4 So.3d 1130, 1135 (Ala.Civ.App.2008) (quoting
 
 Mantiply v. Mantiply,
 
 951 So.2d at 656).
 

 Carroll argues that if his September 2003 profit-sharing agreement does not encompass the hurricane blue-roof projects, then he is entitled to reasonable compensation for the services he performed on those projects. That argument is answered by the fact that Carroll received a salary during the entire time that he worked on the blue-roof projects, and, on the blue-roof project for which he was the project manager, he received a double salary and a $25,000 management fee. Carroll bore the burden of proving the reasonable value of the services he rendered.
 
 See Utah Foam Prods., Inc. v. Polytec, Inc.,
 
 584 So.2d 1345, 1351 (Ala.1991). Carroll presented evidence indicating that other LJC employees received more compensation for their work on the hurricane projects than he did, but that evidence did not establish that the compensation
 
 he
 
 received for the services
 
 he
 
 rendered was inadequate.
 

 To establish a claim of unjust enrichment, Carroll was required to prove that LJC or Clark “ ‘ “holds money which, in equity and good conscience, belongs to [Carroll] or holds money which was improperly paid to [LJC or Clark] because of mistake or fraud.” ’ ”
 
 Avis Rent A Car Sys., Inc. v. Heilman,
 
 876 So.2d 1111, 1123 (Ala.2003) (quoting
 
 Dickinson v. Cosmos Broad. Co.,
 
 782 So.2d 260, 266 (Ala.2000), quoting in turn
 
 Hancock-Hazlett Gen. Constr. Co. v. Trane Co.,
 
 499 So.2d 1385, 1387 (Ala.1986)) (emphasis omitted).
 

 “One is unjustly enriched if his retention of a benefit would be unjust.
 
 Restatement of Restitution: Quasi Contracts and Constructive Trusts
 
 § 1, Comment c. (1937). Retention of a benefit is unjust if (1) the donor of the benefit (here, allegedly [Carroll]) acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit (here, allegedly [LJC or Clark]) engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor, or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched. See
 
 Restatement of Restitution: Quasi Contracts and Constructive Trusts
 
 § 2 at 16. See generally F. Woodward,
 
 The Law of Quasi Contracts
 
 (1913).”
 

 Jordan v. Mitchell,
 
 705 So.2d 453, 458 (Ala.Civ.App.1997).
 

 As we have previously discussed, the parties did not mutually assent that Carroll should receive a 25% share of the profits for the blue-roof projects. Accordingly, Carroll did not act “under a mistake of fact or in misreliance on a right or duty.”
 
 Jordan v. Mitchell,
 
 705 So.2d at 458. Nor did LJC or Clark engage in any wrongful conduct such as fraud.
 
 Id.
 
 
 *460
 
 Therefore, although LJC and Clark may have been enriched by Carroll’s services, they were not unjustly enriched. The trial court did not err by entering a summary judgment in favor of LJC and Clark on Carroll’s quantum meruit and unjust-enrichment claims.
 

 The judgment of the Houston Circuit Court is affirmed.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.