MOORE, Judge.
Kenith Brown and his wife, Laqunda Brown,[1] appeal from a judgment of the Crenshaw Circuit Court (“the trial court”) reforming a “residential lease” (“the contract”) that they had entered into with Ronnie Butts and his wife, Tammy Butts, regarding the lease and purchase of real property and a mobile home located in Luverne. We reverse the trial court’s judgment.

Procedural History

On May 28, 2013, the Buttses filed a complaint against the Browns, seeking, pursuant to Ala.Code 1975, § 8-1-2, to reform the contract that they had entered into with the Browns. The Buttses attached a copy of the contract to their *1184 complaint as an exhibit; that contract identified the Buttses as “Lessor” and the Browns as “Lessee.” Pursuant to the contract, the Buttses agreed to lease to the Browns a mobile home and real property-located in Luverne for a lease term of 30 years—June 1, 2004, to June 30, 2034—for $728 per month. The contract also provided, among other things:
“12. Lessee agrees that Lessor shall have the right to attach ‘For Sale’ or ‘For Rent’ signs or placards on the premises during the last thirty days of the lease term and to show the premises to any person desiring to rent or purchase the premises.
“a) The Lessee hereby and herewith shall have an Option to buy the premises at anytime during the Lease period. Said purchase price shall be $85,000.00. Lessor agrees to apply the entire amount of all lease payments made by Lessee excluding late charges or fees toward a down payment for said purchase at the time of purchase.”
In their complaint, the Buttses asserted that the contract contained an error that was the result of either a mutual mistake of the parties or a mistake of the Buttses that, the Buttses asserted, the Browns knew of or should have suspected at the time the contract was drafted and executed. The Buttses also asserted that the contract had omitted certain necessary clauses and that, as a result, it further failed to properly express the intent of the parties. The Browns answered and counterclaimed, asserting claims of “fraud, misrepresentation, and deceit” and breach of contract against the Buttses. The Buttses filed a reply to the Browns’ counterclaims. Following a hearing on January 6, 2015, the trial court entered a judgment on March 13, 2015, providing, in pertinent part:
“The Court finds that the lease agreement by and between the parties dated May, 2004, is an ambiguous agreement in that it purports to be a thirty (30) year lease agreement but provides for an option price to be paid in full by applying the entire lease payments which would have provided for payment in full of the sales price after the 117th monthly payment. The Court further finds the contract to be ambiguous in allowing for the full amount of the purchase price to be paid after payment of less than one-third (1/3) of the number of lease payments which would have been made in the thirty (30) year life of the lease agreement; allowed for the [Buttses] to erect signs for sale or rent during the last thirty (30) days of the thirty (30) year term; failed to provide any method for the [Browns] to exercise their option rights; failed to provide any method of conveyance of the leased premises; failed to require the [Buttses] to convey a free and clear title to the [Browns] in the event the [Browns] exercised their option to purchase. The Court is further concerned about the validity of [the] lease agreement in that it was not recorded and would be void pursuant to Section 35-4-6, Code of Alabama, after a period of twenty (20) years.

"....

“Therefore, the Court finds that the contract between the [Buttses] and [the Browns] dated May, 2004, does not express the true intent of the parties and reforms the same to the extent that the [Browns] shall only be allowed to exercise their option to purchase the lease property by paying to the [Buttses] the balance due on their financing to Land Investment Group, LLC, on the real estate contract and the balance due CIT Group, or its assigns, at the time they *1185 elect to exercise their option to purchase.”
The Browns filed a postjudgment motion on April 10, 2015; that motion was denied by the trial court on June 16, 2015. The Browns filed their notice of appeal to the Alabama Supreme Court on July 28, 2015; that court subsequently transferred the appeal to this court, pursuant to § 12-2-7(6), Ala.Code 1975.

Facts

Ronnie testified that he and Tammy had purchased 18 acres of real property (“the real property”) in July 2000 for $21,000 from Land Investment Group, LLC. The sales contract indicated that the Buttses made a $2,000 down payment and agreed to make 180 monthly payments of $203.55, which included interest calculated at a rate of 10% per annum. The Buttses thereafter purchased a double-wide mobile home (“the mobile home”) in November 2000, which they placed on the real property in December 2000. The Buttses financed the purchase of the mobile home through CIT Group/Sales Financing, Inc. The terms of the security agreement from that purchase indicate that the Buttses made a down payment of $5,561.85 and agreed to pay a balance of $50,168 through 360 monthly payments of $426.25, which included interest at a rate of 9.62% per annum.
Ronnie stated that, at some point before September 2003, he and Tammy had decided to sell the real property and the mobile home and that the Browns had subsequently contacted him and expressed an interest in purchasing both the real property and the mobile home. Ronnie testified that he and Tammy offered to sell the real property and the mobile home together for a total price of $85,000. According to Ronnie, at that time, he and Tammy had owed a total of approximately $75,000 on the notes that were secured by the real property and the mobile home. The Buttses set the sales price at $85,000 because they had hoped to recover additional amounts that they had paid for improvements to the property and to make a small profit. On September 25, 2003, the parties executed a document entitled “Offer to Purchase Real Estate” in which the Browns agreed to purchase the real property and the mobile home for $85,000, subject to their ability to obtain a mortgage in an amount of not less than $85,000 with an interest rate not to exceed 7.5%.
The parties all testified that the Browns were unable to obtain third-party financing to cover the $85,000. Ronnie subsequently presented the Browns with a lease agreement, pursuant to which they could lease the mobile home for one year for $500 per month; the Browns, however, declined to sign that agreement. Ronnie testified that he had subsequently “come to terms” with the Browns to sell the real property and the mobile home to them for $728 per month to be paid over the course of 30 years. Ronnie testified that he had determined the monthly payment amount to be included in the contract by adding together $430, which was the approximate amount of his and Tammy’s monthly payment on the mobile home, plus $203, which was the approximate amount of his and Tammy’s monthly payment on the real property, plus monthly amounts for taxes and insurance costs. Ronnie testified that he had made the contract term 30 years because his and Tammy’s note on the mobile home was a 30-year note.
Ronnie testified that he did not want the purchase to go on for 30 years, but, rather, he wanted the Browns to acquire financing and to pay the purchase price sooner so he had agreed “to having the $85,000 put into the contract so that they could acquire financing on it at a later date.” Ronnie testified as follows on direct examination by counsel for the Buttses:
*1186 “Q: And did you agree for them to be able to apply any of the lease payments toward the purchase price should they be able to buy it?
“[Ronnie]: That’s right.
“Q: How was that to work? What was the agreement you had with Mr. Brown on that?
“A: I told him, Mr. Brown, you know, anything that they had paid up to it, that it would come off that amount, but we never really talked about any interest.
“Q: Okay. Was it your understanding with Mr. Brown that any—that he be able to buy at any time during the lease if he paid off the debts that you have?
“A: That’s correct.
“Q: Was that your understanding what Mr. Brown—
“A: Yes.
“Q: If he paid off whatever you owed on it, both to Land Investment Group and to the mobile home, then you would deed over to him and convey the mobile home?
“A: That’s right.
“Q: Did you ever agree to finance this property for him without any interest payments?
“A: No.”
Ronnie also testified:
“Q: And you were willing at any time from the contract to convey the property to the Browns once they paid off what you owed on it?
“A: Yes.
“Q: Was that your understanding from Mr. and Mrs. Brown from the beginning?
“A: Yes.”
Ronnie testified that, when they were negotiating the sale, the Browns were aware of the encumbrances on the real property and the mobile home. However, Kenith testified that he did not know of the encumbrances. Although one portion of Laqunda’s testimony indicates that she was aware that the Buttses had a mortgage, in that she testified that the purpose of the contract had been for the Browns to finance the transaction through the Butts-es’ mortgage company, Laqunda also testified that she did not know about any loan the Buttses had on either the real property or the mobile home or the amount of any loan. Kenith testified that he had understood that the Browns would pay the Buttses $728 per month until the $85,000 was paid in full, at which point the Browns would own the real property and the mobile home, with no interest due. Kenith testified that he did not recall having ever discussed paying interest to the Buttses. Laqunda also testified that the parties had never discussed any interest payments and that the terms of their agreement solely contemplated payment of monthly installments of $728 with an option to purchase the real property and the mobile home for a total of $85,000.
Ronnie contacted John Folmar, a local attorney, to draft the contract. Folmar testified that, when he drafted the contract, it had been his understanding that the Browns intended to secure financing to purchase the real property and the mobile home “within a short period of time,” i.e., “one or two years.” He testified that, based on his understanding of the terms the parties wanted included in the contract, he had drafted the contract as a lease with an option to purchase, which he had included in Paragraph 12 of the contract. The contract does not specify any time limit for the exercise of the option to purchase. Folmar testified that he had left the 30-year lease term in the contract “just to try to protect the [Buttses] if something didn’t go through.” Folmar acknowledged that he had not included any provisions regarding interest in the contract although he was aware that the Buttses already had a mortgage on the *1187 real property. Ronnie testified that he had not instructed Folmar to include any provisions regarding interest or amortization of the payments in the contract. Ronnie testified on cross-examination as follows:
“Q: So you didn’t ask [Folmar] to put any language in there saying they would pay off your mortgages?
“A: No.
“Q: So Mr. Folmar put into the contract what you told him to put into the contract?
“A: Right.”
According to Folmar, all the parties read the contract before they signed it in May 2004. The contract includes the following clause:
“16. This Lease contains the entire agreement of the parties and there are no other agreement [sic], verbal or written, affecting this Lease that have not been incorporated herein or attached hereto.”
Kenith testified that the contract did not contain any mistakes.
Ronnie testified that, after the parties signed the contract, the Browns had taken possession of the real property and the mobile home and that they had made the monthly payments due under the contract since that time. He stated that he had applied those monthly payments to the payments that he and Tammy owed on the outstanding notes that were secured by the real property and the mobile home. Laqunda testified that, in February 2013, she and Kenith had chosen to exercise their option in the contract to purchase the real property and the mobile home and that she had sent Ronnie a letter notifying him that she and Kenith were prepared to pay the remaining balance of the $85,000 purchase price-$9,288-so that they could “assume the deed and the title.” The Buttses responded with a letter indicating that a balance of $51,757.74 remained owing on the notes securing the mobile home and the real property and that the Browns would have to pay that amount in order to satisfy the contract. Ronnie also discussed with the Browns on one or two occasions that they could purchase the property by paying off the balances owed on the Buttses’ notes on the real property and the mobile home. The Browns elected to continue making the $728 monthly payments even after having paid the Buttses $85,000. Ronnie testified that it would not be possible for him and Tammy to convey the real property and the mobile home to the Browns because they were both still subject to the notes that he and Tammy had executed when they had purchased them and that he and Tammy could not give the Browns a deed until such time as those notes were paid in full.

Analysis

The Browns argue on appeal that the trial court erred in concluding that the contract is ambiguous.
“Whether a contract is ambiguous is a question of law for the trial court to decide, a decision that we review de novo. See FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc., 914 So.2d 344, 357 (Ala.2005). A contract is ambiguous- if it is ‘reasonably susceptible of more than one meaning.’ Id.”
Carroll v. LJC Defense Contracting, Inc., 24 So.3d 448, 455 (Ala.Civ.App.2009). In Brown Mechanical Contractors, Inc. v. Centennial Insurance Co., 431 So.2d 932, 942 (Ala.1983), our supreme court explained:
“The threshold issue—whether or not the contract is ambiguous—is itself a question of law. Holt v. Davidson, 388 So.2d 548 (Ala.1980). In answering this threshold question, the trial court may consider extrinsic evidence in order to determine whether there is a latent ambiguity arising from some collateral mat *1188 ter outside the writing. Mass Appraisal Services, Inc. v. Carmichael, 404 So.2d 666, 672 (Ala.1981); Gibson v. Anderson, 265 Ala. 553, 92 So.2d 692 (1957).”
The contract at issue in this case provides that the Browns shall have an option “to buy the premises at anytime during the Lease period” from June 1, 2004, until June 30, 2034, for the purchase price of $85,000 and that all payments made by the Browns under the contract, less “late charges or fees,” shall be applied to “a down payment for said purchase at the time of purchase.” Although the trial court might have questioned the need for a 30-year lease term when the full purchase price would be paid off in under 10 years, those terms are not mutually exclusive. Additionally, the terms of the contract are not inconsistent with the clause allowing the Buttses to erect signs for sale or rent during the last 30 days of the 30-year lease term. Thus, there was no patent ambiguity, which is an ambiguity “that is apparent upon the face of the instrument, arising by reason of inconsistency or uncertainty in the language employed,” Meyer v. Meyer, 952 So.2d 384, 391 (Ala.Civ.App.2006), in the contract.
“[A] latent ambiguity is one that ‘appear[s] only as the result of extrinsic or collateral evidence showing that a word, thought to have but one meaning, actually has two or more meanings.’ ” Meyer, 952 So.2d at 392 (quoting 11 Williston on Contracts § 33:40 at 816 (4th ed.2003)). The trial court allowed the parties to testify as to their understanding of the contract and their intentions with regard to their agreement. Based on that testimony, it appears that the parties had two different intentions with regard to the terms of the contract because Ronnie testified that he had intended for the Browns to own the real property and the mobile home upon satisfaction of the notes owed on both and because the Browns testified that they had understood the agreement to be in accordance with the terms as stated in the contract, i.e., that the entirety of their monthly lease payments would be applied to the purchase price and that, once they had paid the $85,000, they would own the property. The discrepancy in the parties’ intentions, however, does not create an ambiguity in the contract itself. See Antram v. Stuyvesant Life Ins. Co., 291 Ala. 716, 720, 287 So.2d 837, 840 (1973) (“The mere fact that adverse parties contend for different constructions does not of itself force the conclusion that the disputed language is ambiguous.”).
To the extent the trial court also found that the contract was ambiguous because it failed to provide any method for the Browns to exercise their option rights, our supreme court has adopted language indicating that, “ ‘[i]n the absence of any provision in the option contract with reference to the manner by which an option can be exercised, it is the general rule that any manifestation, either oral or written, indicating an acceptance on the part of the optionee is sufficient.’ ” McMillan, Ltd. v. Warrior Drilling & Eng’g Co., 512 So.2d 14, 23 (Ala.1986) (quoting Duprey v. Donahoe, 52 Wash.2d 129, 133-34, 323 P.2d 903, 905 (1958)). The trial court also noted as an ambiguity that the contract failed to provide any method of conveyance of the leased premises. We note, however, that “[w]here a contract is silent, usage or custom becomes a part of the contract.” Green Tree Fin. Corp. of Alabama v. Wampler, 749 So.2d 409, 415 (Ala.1999). Additionally, the “manner of performance as well as the terms of performance of a contract may be implied from the facts.” Watts Homes, Inc. v. Alonzo, 452 So.2d 1331, 1332 (Ala.Civ.App.1984). In the present case, it could be inferred, based on typical transactions involving the sale of *1189 property, that the method of conveyance would be by deed and transfer of title. To the extent the trial court concluded that the failure of the contract to require the Buttses to convey a free and clear title to the Browns in the event the Browns exercised their option to purchase also amounted to an ambiguity, we note that such a requirement “is usually implied when not otherwise stipulated.” Alabama Butane Gas Co. v. Tarrant Land Co., 245 Ala. 550, 552, 18 So.2d 91, 93 (1944).
The trial court also expressed its concern regarding the validity of the contract based on the fact that it was not recorded and that it “would be void pursuant to Section 35-4-6, Code of Alabama, after a period of twenty (20) years.” Section 35-4-6, Ala.Code 1975, provides, in pertinent part, that
“[ljeases for more than 20 years shall be void for the excess over said period unless the lease or a memorandum thereof is acknowledged or approved as required by law in conveyances of real estate and recorded within one year after execution in the office of the judge of probate in the county in which the property leased is situated.”
It is undisputed that the contract was signed in 2004. Because 20 years have not yet elapsed since the signing of the contract, § 35-4-6 would not yet apply.
The Buttses argue on appeal that the exclusion of “late charges or fees” from the application of the lease payments to the purchase price creates an ambiguity because, they say, the contract does not define “fees.” We disagree. An undefined word or phrase does not create an inherent ambiguity. Hipsh v. Graham Creek Estates Owners Ass’n, 927 So.2d 846, 849 (Ala.Civ.App.2005). “To the contrary, where questions arise as to the meaning of an undefined word or phrase, the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it.” Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d 687, 692 (Ala.2001). In the present case, the contract refers to late charges for failure to pay rent on time, and, in that same paragraph, it refers to the Browns’ responsibility for paying all costs of collecting all rent payments, including reasonable attorney’s fees. We conclude that a reasonable interpretation of the reference to “fees” later in the contract was likely with regard to those fees referenced earlier in the contract itself or could have simply been reiterating that late charges or late fees were not to be included in the calculations. Similarly, the Buttses’ argument on appeal that the reference to “rent” payments in other portions of the contract, as opposed to the portion of the contract stating that “lease payments” are to be applied to the purchase price, is without merit. It is a reasonable interpretation of the contract to consider the reference to “lease payments” as the monthly “rent” payments discussed earlier in the contract, because those two terms are synonymous.
The Buttses also argue on appeal that the contract is ambiguous because the contract does not indicate what would happen with regard to payments made in excess of the $85,000 purchase price in the event the Browns paid the monthly lease payments for 20 years, then decided to exercise their option to purchase. Although the Browns attempted to exercise their option to purchase before the $85,000 purchase price had been paid, we conclude that the possibility of their having paid greater than $85,000 before exercising their option to purchase does not render the contract ambiguous. The contract states that the lease payments are to be applied to the purchase price pursuant to the option to purchase. The contract also states that the lease amount is $728 per *1190 month. Thus, any lease payments that were not applied to the purchase price remain lease payments in accordance with the terms of the contract itself.
Because the contract in the present case is not ambiguous, the trial court should have proceeded to ‘“determine the force and effect of the terms of the contract as a matter of law.’ ” Cherokee Farms, Inc. v. Fireman’s Fund Ins. Co., 526 So.2d 871, 873 (Ala.1988) (quoting Wigington v. Hill-Soberg Co., 396 So.2d 97, 98 (Ala.1981)). As discussed above, the contract, as written, provides for the application of each of the Browns’ lease payments toward the $85,000 purchase price stated in the contract. This is not the end of our inquiry, however. The Buttses also sought in their complaint to reform the contract based on mistake.
The Browns argue on appeal that the trial court erred in reforming the contract. We agree. Section 8-1-2, Ala. Code 1975, provides:
“When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.”
The Browns argue on appeal that the trial court erred in determining that the contract did not express the intention of the parties.
“ ‘[WJhen a writing through mutual mistake of the parties, or mistake of one of the parties, and fraud or deception on the part of the other, or mistake of the scrivener who drew the contract for the parties, contains substantially more or less than the parties intended nr the intention of the parties is not expressed “due to inapt language” it will be reformed to express the true intention of the parties.’ Atlas Assur. Co., Ltd., of London, England v. Byrne, 235 Ala. 281, 282, 178 So. 451, 452 (1938). Alabama views scrivener’s errors as mutuality of mistake, and such errors are subject to reformation. Sherman v. Woerner Magnolia Farms, Inc., 565 So.2d 601, 604 (Ala.1990). A party seeking to have an instrument reformed must produce clear and convincing evidence that the .instrument does not express the intent of the parties. Pinson v. Veach, 388 So.2d 964 (Ala.1980). ‘[T]he parol evidence rule is no impediment when one seeks to reform a conveyance because of mutual mistake.’ West v. Law, 577 So.2d 445, 446 (Ala.1991); § 8-1-2, Ala. Code 1975. Generally, a unilateral mistake is not a ground for reformation. American Liberty Ins. Co. v. Leonard, 270 Ala. 17, 115 So.2d 470 (1959). Reformation is authorized when there is fraud or inequitable conduct on the part of the other party to the contract. Id.”
Pullum v. Pullum, 58 So.3d 752, 756-57 (Ala.2010).
In the present case, as discussed above, the testimony reveals that the parties had different intentions with regard to the purchase option in the contract. Although Folmar testified that the parties had intended for the Browns to exercise their option to purchase the real property and the mobile home earlier than they ultimately exercised that option, Folmar’s testimony did not indicate that the contract contained a mutual mistake or that the parties’ intentions regarding the terms of the agreement were not accurately expressed in the contract. Rather, his testimony spoke to the parties’ intentions regarding the timing of their actions after the contract was signed. Ronnie, Kenith, and Laqunda all testified that the parties *1191 had not discussed interest at any time with regard to the purchase of the real property and the mobile home or the drafting of the contract. Thus, there is no indication of mutual mistake or fraud in the contract.
To the extent that the contract fails to properly express the intention of the Buttses in memorializing their agreement with the Browns, our supreme court discussed the effect of such a unilateral mistake in Ex parte Perusini Construction Co., 242 Ala. 632, 635-36, 7 So.2d 576, 578 (1942):
“It has been declared that if, in the expression of the intention of one of the parties to an alleged contract, there is error, and that error is unknown to and unsuspected by the other party, that which was so expressed by the one party and agreed to by the other is valid and binding as a contract, which the party not in error may enforce. In other words, a party to a contract cannot avoid it on the ground that he made a mistake where there has been no misrepresentation, and there is no ambiguity in the terms of the contract, and the other contractor has no notice of such mistake and acts in perfect good faith. A unilateral error, it has been said does not avoid a contract. But this rule is by no means invariably applied in the cancellation of contracts. It is said that mistake may be a good defense when hardships amounting to injustice would be inflicted on a party by holding him to his apparent bargain, and where it is unreasonable to hold him to it. However, a unilateral mistake in the making of a contract, of which the other contracting party is entirely ignorant, and to which he in no way contributes, will not affect the contract, or afford ground for its avoidance or rescission, unless it be such a mistake as goes to the substance of the contract itself. Not only must the mistake be material to the transaction, but the person who made the mistake must show, when he applies to an equity court for a rescission of the contract, that his mistake is not due to want of care or diligence, although the conclusion warranted by the best considered authorities is that mere neglect may not be a bar to the setting aside of the contract unless it is such as amounts to the violation of a positive legal duty and such as prejudiced the other party. What has been said applies only to cases in which one of the parties is entirely innocent of the other’s mistake.
“If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation and the other party realizing that a mistake must have been committed, takes advantage of it and refuses to let the mistake be corrected when it is discovered, he cannot under these conditions claim an enforceable contract. Where there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract. 6 R.C.L. page 623, section 42; 12 Amer. Jur. 624, section 133, and cases there cited.”
The Browns argue that they had no reason to suspect that a mistake had been made in the drafting of the contract. We agree. Ronnie testified repeatedly that he had intended that the Browns would acquire the real property and the mobile home upon payment of the debts the Buttses owed on them, which, Ronnie testified, amounted to approximately $75,000 in 2004. Even assuming, for the sake of appellate review, that the Browns agreed to pay off the Buttses’ debts in order to acquire the property, the fact remains that the Buttses never disclosed the terms of those debts to the Browns. From their perspective, the $85,000 pur *1192 chase price, which Ronnie testified he had calculated in order to clear the debts and to make a small profit, was sufficient to cover whatever debts the Buttses owed. The evidence is undisputed that at no point did the parties discuss interest payments or an amortization schedule, so the Browns could not have known that the $85,000 purchase price would be subject to change over time. Based on the circumstances, the Browns could not have known that the Buttses had made a mistake in calculating the purchase price by failing to account for interest.
The Buttses did not present clear and convincing evidence indicating that the contract failed to express the intent of the parties. See Pullum, supra. Moreover, it is clear that the trial court’s reformation would prejudice the Browns, who believed that they would receive the real property and the mobile home in accordance with the terms of the contract as written. See Ex parte Perusini, supra. Because the trial court erred in reforming the contract, which was the result, at best, of a unilateral mistake by the Buttses, we reverse the trial court’s judgment and remand the case for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.

. Laqunda signed the contract at issue in this case as "Laqunda Julian.” Subsequently, La-qunda and Kenith were married, and Laqun-da testified at the trial that her full name is now "Laqunda Julian Brown.”